*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0082P (6th Cir.)
File Name: 04a0082p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

MURRAY HILL PUBLICATIONS, INC.,
 *Plaintiff-Appellee/ Cross-Appellant,*

 *v.*

TWENTIETH CENTURY FOX FILM CORPORATION,
 *Defendant-Appellant/ Cross-Appellee.*

Nos. 01-2668/2721

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 97-60405—Marianne O. Battani, District Judge.

Argued: August 7, 2003

Decided and Filed: March 19, 2004

Before: BOGGS, Chief Judge; SILER, Circuit Judge; and
RICE, District Judge.[*]

———————————

* The Honorable Walter Herbert Rice, United States District Judge for the Southern District of Ohio, sitting by designation.

———————————

### COUNSEL

**ARGUED:** Louis P. Petrich, LEOPOLD, PETRICH & SMITH, Los Angeles, California, for Appellant. Mayer Morganroth, MORGANROTH & MORGANROTH, Southfield Michigan, for Appellee. **ON BRIEF:** Louis P. Petrich, LEOPOLD, PETRICH & SMITH, Los Angeles, California, Maria N. Bernier, Gregory B. Jordan, REED & SMITH, Pittsburgh, Pennsylvania, Laurie J. Michelson, BUTZEL LONG, Detroit, Michigan, J. Michael Huget, BUTZEL LONG, Ann Arbor, Michigan, for Appellant. Mayer Morganroth, Jeffrey B. Morganroth, Jason R. Hirsch, MORGANROTH & MORGANROTH, Southfield, Michigan, for Appellee.

———————————

### OPINION

———————————

BOGGS, Chief Judge. Twentieth Century Fox Film Corporation ("Fox") appeals following a jury verdict in favor of plaintiff, Murray Hill Publications, Inc. ("Murray Hill"), in its action for copyright infringement. During the creation of the movie "Jingle All The Way" ("JATW"), Fox received from Murray Hill a submission of the screenplay for "Could This Be Christmas" ("CTBC"). After the theatrical release of JATW, Murray Hill sued Fox, alleging that the JATW movie infringed upon its copyright of the CTBC screenplay. At trial, both Fox and Murray Hill presented expert evidence to establish whether the JATW movie was substantially similar to the CTBC screenplay. After the jury returned a verdict for Murray Hill, the district court disallowed damage items representing the bulk of the jury award and denied attorney's fees to Murray Hill. On appeal, Fox argues that it was

entitled to summary judgment on the issue of substantial similarity, that the trial was tainted by improper expert testimony by Murray Hill's expert witness and by misleading jury instructions, necessitating a new trial, and that the damages awarded were unsupported in law or fact. Murray Hill cross-appealed and argues that it was entitled to the full damages awarded by the jury and also to attorney's fees. We reverse because Fox was entitled to judgment as a matter of law. We do not reach the issues of the expert evidence, the jury instructions, the attorney's fees, or the damages.

**I**

The principal author of the JATW screenplay was Randy Kornfield, a Fox script reader and freelance writer of screenplays. In 1993, Kornfield tried to buy a Mighty Morphin' Power Ranger action figure as a birthday present for his son. The difficulties he encountered in this pursuit and conversations with other parents similarly engaged gave Kornfield the idea for a screenplay. On January 11, 1994, Kornfield registered his "treatment," a six-page summary of a proposed screenplay, then called "A Christmas Hunt," with the Writer's Guild of America. On July 17, he registered a fleshed-out screenplay of this treatment. Executives at the Fox Searchlight division liked the screenplay and bought it for "1492 Pictures," a production company affiliated with Fox. From November 1994 through June 1995, Kornfield worked with Fox and 1492 Pictures to revise the screenplay. In November 1995, Fox hired two more scriptwriters to continue editing and enhancing the screenplay. During this editorial process, the screenplay acquired the JATW title.

The author of the CTBC screenplay was Brian Webster, a Detroit school teacher and aspiring script writer. In 1988, inspired by his difficulties in obtaining a Golden Batman as a Christmas present for his son, Webster wrote the first draft of a screenplay, initially entitled "Action Man: The Toy,"

then "So This Is Christmas," and finally "Could This Be Christmas." Webster first registered this screenplay with the Copyright Office in 1989 and re-registered it in 1991. From 1989 through 1993, Webster and his agent made repeated attempts to sell this screenplay to a variety of potential producers. While Murray Hill pleaded a number of theories on how the screenplay could have found its way to Fox during this period, the district court considered all of the theories too speculative and found that Fox did not have access to the CTBC screenplay during this period. Murray Hill does not raise this issue on appeal. Significantly, on February 4, 1994, Webster sold an option to CTBC to Murray Hill and eventually transferred all rights in CTBC to Murray Hill. On June 21, Murray Hill submitted CTBC to the Family Film division of Fox. On July 9, the CTBC screenplay was read and summarized by Rudy Romero, another Fox script reader and friend of Kornfield's. Romero was also the script reader who a few months later performed the same task for the JATW screenplay. On August 1, Fox declined the CTBC screenplay. After Fox declined the screenplay, Murray Hill made no further attempts to sell it.

At some time in February 1996, Robert Laurel, the principal of Murray Hill, read an article in *Daily Variety* about the JATW movie then in production. Concerned about the apparent similarities between JATW and CTBC, Laurel contacted his attorneys, who sent a series of cease-and-desist letters to Fox. Early settlement negotiations between Fox and Murray Hill failed over Murray Hill's unwillingness to commit to any particular theory of how and when Fox could have obtained access to the CTBC screenplay and Fox's refusal to share some of its information until Murray Hill committed to such a theory. Nevertheless, Fox proceeded with the JATW movie. On November 22, 1996, the movie was released and quickly proved to be a commercial success.

As of December 2000, the JATW movie had earned $183 million.

On December 3, 1997, Murray Hill filed suit against Fox in the United States District Court for the Eastern District of Michigan. While this complaint alleged a multitude of theories of liability, the only claim still relevant is Murray Hill's allegation that the JATW movie infringed upon the copyright of the CTBC screenplay. The court made a finding that Murray Hill failed to establish directly that Fox had access to the CTBC screenplay at any time before Murray Hill submitted it to Fox. The case then proceeded to trial by jury. The district court instructed the jury based on the Ninth Circuit's test for judging the "substantial similarity" of copyrighted works. As the jury was deliberating, the court found that the JATW treatment, created prior to the CTBC submission, did not infringe on the CTBC screenplay.[1] However, the jury was not informed of this ruling. Four days later, the jury rendered a verdict in favor of Murray Hill. The damages included $1 million in producer's fees and $500,000 in writer's fees that Murray Hill lost because Fox did not contract with it for these services, $2 million in lost goodwill, and $500,000 in merchandising revenue Fox earned from the sales of a JATW sound track and toys. While the jury found that JATW had not yet earned any profits for Fox, it estimated Fox's future profits on JATW at $15 million and also awarded that amount to Murray Hill. Accordingly, district court entered judgment in favor of Murray Hill in the sum of $19 million. Fox renewed its motion for judgment as a matter of law and also moved for new trial. The court granted Fox's motion for judgment as a matter of law with

---

[1] The earlier finding did not preclude all possibility that the JATW treatment infringed, because Murray Hill had argued that the alleged "striking similarity" between the CTBC screenplay and the JATW treatment established access inferentially.

respect to all damage items except the producer's and writer's fees, thus reducing the award to $1.5 million. The court also declined to award attorney's fees to Murray Hill and entered judgment in the reduced amount. Before this court now are Fox's timely appeal and Murray Hill's timely cross-appeal.

## II

To determine whether the district court erred in allowing this case to go to the jury, we must look both at the developing law of copyright as it addresses the elements of proof for copyright infringement, and to the specific elements of the two works before us. We will first lay out the framework of law, as our circuit has pronounced it (Part III); then describe the dramatic elements of the two works (Part IV); and, finally, apply the law to an assessment of the relation of the protectible elements of the copyrighted work to the overall tenor of the allegedly infringing work (Part V).

## III

Title 17 of the United States Code protects owners' copyrights in creative works. 17 U.S.C. §§ 101-1332. Copyright owners have the exclusive right to reproduce the protected work, to prepare derivative works, and to distribute copies to the public. 17 U.S.C. § 106(1)-(3). In the case of infringement, the owner of a copyrighted work may seek injunctive relief, impoundment and disposition of the infringing articles, damages, infringer's profits, and legal costs, including attorney's fees. 17 U.S.C. §§ 502-505. "To succeed in a copyright infringement action, a plaintiff must establish that he or she owns the copyrighted creation, and that the defendant copied it." *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003); *see also Feist v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). "However, in most cases courts have no objective evidence of the process by which the challenged object was developed and thus are forced to rely on the

inferences which may be drawn from two basic facts: access and similarity." *Glanzmann v. King*, 8 U.S.P.Q.2d 1594, 1595 (E.D. Mich. 1988) (citing *Ideal Toy Corp. v. Kenner Prods.*, 443 F. Supp. 291 (S.D.N.Y. 1977)). "[W]here there is no direct evidence of copying, a plaintiff may establish 'an inference of copying by showing (1) *access* to the allegedly-infringed work by the defendant(s) and (2) a *substantial similarity* between the two works at issue.'" (emphases added). *Kohus*, 328 F.3d at 853-54 (quoting *Ellis v. Diffie*, 177 F.3d 503, 506 (6th Cir. 1999)). "Thus, copying is an essential element of infringement and substantial similarity between the plaintiff's and defendants' works is an essential element of copying." *Wickham v. Knoxville Int'l Energy Exposition*, 739 F.2d 1094, 1097 (6th Cir. 1984) (citations omitted).

The access element of a copyright infringement claim is usually the less problematic. "Access is essentially 'hearing or having a reasonable opportunity to hear the plaintiff['s] work and thus having the opportunity to copy.'" *Ellis*, 177 F.3d at 506 (quoting *Tree Publ'g Co. v. Warner Bros. Records*, 785 F. Supp. 1272, 1274 (M.D. Tenn. 1991)). "Access is proven when the plaintiff shows that the defendant had an opportunity to view or to copy plaintiff's work." *Glanzmann*, 8 U.S.P.Q.2d at 1595 (citing *Sid & Marty Krofft Television Prods. v. McDonald's Corp.*, 562 F.2d 1157, 1163 (9th Cir. 1977)). "Although 'evidence that a third party with whom both the plaintiff and defendant were concurrently dealing had possession of plaintiff's work is sufficient to establish access by the defendant,' '[a]ccess may not be inferred through mere speculation or conjecture.'" *Ellis*, 177 F.3d at 506 (quoting 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.02[A] (hereinafter "Nimmer")). "A mere assertion of access, unsupported by probative evidence is inadequate." *Glanzmann*, 8 U.S.P.Q.2d at 1595 (citing *Scott v. Paramount Pictures Corp.*, 449 F. Supp. 518,

520 (D.D.C. 1978), *aff'd*, 607 F.2d 494 (D.C. Cir. 1979)). "Nor is a 'bare possibility' of access sufficient. A plaintiff must establish that defendant(s) had a 'reasonable possibility' to view plaintiff's work." *Glanzmann*, 8 U.S.P.Q.2d at 1595 (citing *Meta-Film Assocs. v. MCA, Inc.*, 586 F. Supp. 1346, 1355 (C.D. Cal. 1984)). *See also Grubb v. KMS Patriots, L.P.*, 88 F.3d 1, 4 (1st Cir. 1996) (denying copyright infringement claim on design of football team's logo where alleged infringer had largely completed his design before access to plaintiff's design).

Where the plaintiff cannot prove access, the copyright infringement claim can still succeed, but only by proof of a higher level of similarity than the merely substantial. *See Ellis*, 177 F.3d at 507 (noting that "[s]ome case law indicates that the stronger the similarity between the two works in question, the less compelling the proof of access needs to be" (citing Nimmer § 13.02[B])). The quantum of similarity that will substitute for proof of access is "striking similarity." Such striking similarity "preclude[s] the possibility of independent creation." *Glanzmann*, 8 U.S.P.Q.2d at 1595 (citing *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111 (5th Cir. 1978)). Of course, even in a striking similarity case, "[a]bsent copying, there can be no infringement." *Mazer v. Stein*, 347 U.S. 201, 218 (1954). However, striking similarity carries the burdens of proof that the infringing work is sufficient similar as to intrude into the copyrighted work's protection *and* that the defendant must have had access to the copyrighted work, even if the plaintiff can provide no extrinsic proof of that fact.

In the usual infringement case, access can be shown and the more difficult proof is that of "substantial similarity." In order to focus this inquiry, "[c]ourts have established various tests for the substantial similarity finding." *Kohus*, 328 F.3d at 854. "The traditional approach is the 'ordinary observer' or 'audience' test, which 'requires the trier of fact to gauge the similarities of the two works solely on the basis of his 'net

impression' and without relying on expert analysis or dissection.'" *Ibid.* (citing *Ellis*, 177 F.3d at 506 n.2). "[C]ourts have undertaken various modifications—typically, by adding a prior step that does allow expert testimony and analytic dissection." *Kohus*, 328 F.3d at 854.

The Second Circuit has adopted a test that distinguishes between two essential elements in a substantial similarity suit–"(a) that defendant copied from plaintiff's copyrighted work and (b) that the copying (assuming it to be proved) went so far as to constitute improper appropriation." *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946). Expert testimony is appropriate under the first part, but not under the second because "the determination of improper copying is to be made from the viewpoint of the ordinary observer." *Kohus*, 328 F.3d at 854 (citing *Arnstein*). The Ninth Circuit, the court of appeals with the largest case load and experience in the area of movie industry copyright infringement, has adopted an alternative two-part test. This test consists of an "'extrinsic test,' in which expert testimony and analytic dissection may be employed to help the jury 'determine whether there has been copying of the expression of an idea rather than just the idea itself' . . . and the 'intrinsic test,' in which expert testimony is not appropriate because the trier of fact must determine substantial similarity from the viewpoint of the ordinary reasonable person." *Kohus*, 328 F.3d at 854 (summarizing *Krofft*, 562 F.2d at 1163-64). While these names for the parts have remained, "[b]ecause the criteria incorporated into the extrinsic test encompass all objective manifestations of creativity, the two tests are more sensibly described as objective and subjective analyses of expression, having strayed from *Krofft's* division between expression and ideas." *Shaw v. Lindheim*, 919 F.2d 1353, 1357 (9th Cir. 1990) (citations omitted). The extrinsic test focuses on articulable similarities between plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in the two

works. *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1046 (9th Cir. 1994). "[S]atisfaction of the extrinsic test creates a triable issue of fact in a copyright action involving a literary work." *Shaw*, 919 F.2d at 1359.

This court, however, had until recently not adopted any of the refined versions of the substantial similarity test. *Ellis*, 177 F.3d at 506 n.2. Lacking guidance, the district court in the present case adopted the Ninth Circuit test. However, while this appeal was pending, we, in *Kohus*, adopted the District of Columbia Circuit's test. In this test "the first step 'requires identifying which aspects of the artist's work, if any, are protectible by copyright,' the second 'involves determining whether the allegedly infringing work is 'substantially similar' to protectible elements of the artist's work.'" *Kohus*, 328 F.3d at 855 (quoting *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1295, 1296 (D.C. Cir. 2002)). This test is more similar to the Ninth Circuit test than it is to the Second Circuit test. *See Kohus*, 328 F.3d at 855 n.1 (tracing history of the *Sturdza* test). The second part of our test, and the Ninth Circuit's *intrinsic* test, both address the question of whether the two works are, taken as a whole, substantially similar in look and feel to a jury. The first part of our test, and the Ninth Circuit's *extrinsic* test, both require a determination of what elements of the copyrighted work are protected by the law and an exclusion of consideration of all elements that are not.

However, significant differences remain in both parts. In particular, we apply a more stringent standard regarding when to allow expert testimony on the first part of the test. Also, not having adopted the eight *Kouf* factors, the first part of our test remains more free in form than the Ninth Circuit's extrinsic test. "The essence of the first step is to filter out the unoriginal, unprotectible elements . . . through a variety of analyses." *Kohus*, 328 F.3d at 855 (citing *Feist*, 499 U.S. at 345).

This brings us to the most complex part of the substantial similarity inquiry: the determination of which parts of the original work are protectible and which are not. It is "impossible to articulate a definitive demarcation that measures when the similarity between works involves copying of protected expression; decisions must inevitably be ad hoc." *Shaw*, 919 F.2d at 1356 (citing *Krofft*, 562 F.2d at 1164). Nevertheless, certain categorical judgments and guideposts have been established. Unoriginal work enjoys no copyright protection. "The *sine qua non* of copyright is originality. To qualify for copyright protection, a work must be original to the author." *Feist*, 499 U.S. at 345. "[I]t is a constitutional requirement that a plaintiff bringing an infringement claim must prove 'copying of constituent elements of the work *that are original*.'" *Kohus*, 328 F.3d at 853 (emphasis added in *Kohus*) (quoting *Feist*, 499 U.S. at 361). However, "the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." *Feist*, 499 U.S. at 345 (quoting 1 Nimmer, § 1.08[C][1]).

In the general run of cases, where minimal creativity can be shown, the vital distinction is between ideas and their expressions. Copyright does not protect ideas, but only the expression of ideas. *Kohus*, 328 F.3d at 855.[2] "The real task in a copyright infringement action, then, is to determine

---

[2]Of the two principles, that ideas are not protectible and that expressions are protectible, it is the former that is the stronger. Where an idea by necessity, or near-necessity, or custom, leads to a particular expression, it is the expression which becomes unprotected, rather than the idea that becomes protected. To reach the opposite conclusion would, through the backdoor, create a forbidden copyright in ideas. *Shaw*, 919 F.2d at 1360.

whether there has been copying of the expression of an idea rather than just the idea itself." *Krofft*, 562 F.2d at 1163. "[N]o one infringes, unless he descends so far into what is concrete [in a work] as to invade . . . [its] expression." *Nat'l Comics Publ'ns v. Fawcett Publ'ns*, 191 F.2d 594, 600 (2d Cir. 1951). To draw the distinction between ideas and their expressions, courts use the abstraction test first described by Judge Learned Hand with respect to a theatrical play. *Kohus*, 328 F.3d at 855.

Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930). This test will only place a work's elements on a spectrum from more expression-like to more idea-like. It does not pick the point on the spectrum at which elements cease to be unprotected ideas and become protectible expressions. Nevertheless, it serves as a useful, if not dispositive, analytical tool in drawing these distinctions. *See Peter Pan Fabrics v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960) (noting that "no principle can be stated as to when an imitator has gone beyond copying the 'idea,' and has borrowed its 'expression'" and that such decisions hence must "inevitably be ad hoc").

Within the realm of works of fiction, literary or cinematographic, expressions not protectible because they follow directly from unprotectible ideas are known as scènes

à faire, "those elements that follow naturally from the work's theme, rather than from the author's creativity." *Kohus*, 328 F.3d at 856 (quoting Nimmer § 13.03[F][3]). Scènes à faire are those "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." *Sturdza*, 281 F.3d at 1295. A few examples provide concreteness to this definition:

> If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress. These would be no more than Shakespeare's 'ideas' in the play, as little capable of monopoly as Einstein's Doctrine of Relativity, or Darwin's theory of the Origin of Species. It follows that the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly.

*Nichols*, 45 F.2d at 121. Other genres provide additional examples of scènes à faire. "Elements such as drunks, prostitutes, vermin and derelict cars would appear in any realistic work about . . . policemen in the South Bronx" and are therefore not protectible. *Walker v. Time Life Films*, 784 F.2d 44, 50 (2d Cir. 1986). Similarly, "[f]oot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop, are venerable and often-recurring themes of police fiction," and hence not protectable. *Ibid.* "While both the Dinosaur World books and the Jurassic Park works share a setting of a dinosaur zoo or adventure park, with electrified fences, automated tours, dinosaur nurseries, and uniformed workers, these settings are classic scenes a faire that flow from the uncopyrightable concept of a dinosaur zoo. Thus, though perhaps substantially similar, the settings

are not protectible." *Williams v. Crichton*, 84 F.3d 581, 589 (2d Cir. 1996). "The common use of such stock . . . merely reminds us that in Hollywood, as in the life of men generally, there is only rarely anything new under the sun." *Id.* at 588 (quoting *Berkic v. Crichton*, 761 F.2d 1289, 1294 (9th Cir. 1985)).

Another question of degree in the evaluation of substantial similarity is the amount of copying necessary to establish infringement. At the extremes, the rules of law are again clear. "Duplication or near identity is not necessary to establish infringement. " *Krofft*, 562 F.2d at 1167 (citing *Runge v. Lee*, 441 F.2d 579, 582 (9th Cir. 1971), and *Williams v. Kaag Mfrs.*, 338 F.2d 949, 951 (9th Cir. 1964)). "A story has a linear dimension: it begins, continues, and ends. If a defendant copies substantial portions of a plaintiff's sequence of events, he does not escape infringement by adding original episodes somewhere along the line." *Warner Bros. v. ABC*, 720 F.2d 231, 241 (2d Cir. 1983). "The misappropriation of even a small portion of a copyrighted work . . . may constitute an infringement under certain circumstances." *Murray Hill Publ'ns v. ABC Comm.*, 264 F.3d 622, 633 (6th Cir. 2001) (citing *Universal Pictures Co. v. Harold Lloyd Corp.*, 162 F.2d 354, 361 (9th Cir. 1947)). "Even if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity." *Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir. 1987). "No plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Shaw*, 919 F.2d at 1362 (quoting Nimmer, § 13.03[B][1][a]). However, "individual lines of dialogue [in a movie] are not automatically entitled to copyright protection." *ABC*, 264 F.3d at 632. "[W]hen a single line of a larger copyrighted work is appropriated by an alleged infringer, the test is whether 'the work is recognizable by an ordinary observer as having been taken from the copyrighted

source.'" *Id.* at 633 (quoting *Harold Lloyd*, 162 F.2d at 361). "[I]t is the combination of many different elements which may command copyright protection because of its particular subjective quality." *Krofft*, 562 F.2d at 1169 (citing *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91-92 (2d Cir. 1976), and *Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623, 624 (2d Cir. 1962)). "While any one similarity taken by itself seems trivial, . . . it would [not] be improper for a jury to find that the over-all impact and effect indicate substantial appropriation." *Krofft*, 562 F.2d at 1169 (quoting *Malkin v. Dubinsky*, 146 F. Supp. 111, 114 (S.D.N.Y. 1956)). However, "random similarities scattered throughout the works" can be discounted. *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984). "Such a scattershot approach cannot support a finding of substantial similarity because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another." *Williams*, 84 F.3d at 590 (citing *Walker*, 784 F.2d at 50, and *Burroughs v. Metro-Goldwyn-Mayer*, 683 F.2d 610, 624 (2d Cir. 1982)).

Finally, the issue arises of the proper standard for appellate review of a grant or denial of a motion for judgment as a matter of law in a copyright infringement case. The cornerstone of such review in copyright infringement cases, just as in other cases, is whether, given the law and evidence presented, a reasonable jury could have found for the non-moving party. Nevertheless, the issue of whether substantial similarity exists has certain features with special significance in the application of this standard. A jury deciding the issue of substantial similarity not only makes findings of historical fact, but usually also serves as a proxy for the works' intended audience. In this role as proxy, jurors decide not only what happened, but also can be properly influenced by whether their exposure to the alleged infringing work would diminish their appetite for the copyrighted work. *See Kohus*,

328 F.3d at 856-57. As the diminished market for copyrighted work is the harm that the copyright law seeks to avoid, this issue is crucial and contains an element of subjectivity not found in most other jury determinations. Therefore, courts have recognized "that granting summary judgment, particularly in favor of a defendant, is a practice to be used sparingly in copyright infringement cases." *Wickham*, 739 F.2d at 1097; *accord Kohus*, 328 F.3d at 853. However, even taking into account this factor, summary judgment is still permissible and may even be required. *Wickham*, 739 F.2d at 1097; *Kohus*, 328 F.3d at 853. Courts "have frequently affirmed summary judgment in favor of copyright defendants on the issue of substantial similarity." *Shaw*, 919 F.2d at 1355. One reason to do so is that the question of substantial similarity can usually be decided on the basis of the works themselves and rarely, if ever, involves questions of credibility, the peculiar province of the jury. Also, while judges "may not be qualified literary critics, [they] are fitted by training and experience to compare literary works and determine whether they evidence substantial similarity." *O'Neill v. Dell Publ'g Co.*, 630 F.2d 685, 690 (1st Cir. 1980).

### IV

With this background on some relevant aspects of the law of copyright infringement, we turn to the facts of this case. The crucial issue is the degree of similarity between CTBC and JATW. While both of these works went through numerous revisions, Murray Hill's core claim is that the JATW *movie* infringes on its copyright to the CTBC *screenplay*. A detailed summary of both is in order:

CTBC tells the story of Bess Parker, a poor white divorced cleaning woman with a six-year-old son, Tommy. Lacking a father figure, Tommy focuses obsessively on "Action Man," a super-hero action figure. Twelve days before Christmas,

Bess goes to the local toy store to buy the toy she has previously reserved. But when she finds herself short of cash to pay for it and the store clerks refuse to hold it for her any longer, Bess hides the toy in the store. The next day Bess returns to buy the toy she stashed away, but it is snatched out of her hands by Clare, a wealthy black woman who owns and operates a real estate business. Bess attempts to recover the toy by threatening Clare with an authentic-looking toy gun, but Clare gets away. Dejected, Bess returns to the subsidized apartment that she shares with her mother. Bess and Tommy buy a cheap Christmas tree and decorate it.

The next day, while cleaning the home of Carol, an employee of Clare's, Bess meets Steve, Carol's brother and owner of a toy store. Later that day, Bess takes Tommy to see a toy store Santa Claus without realizing that it is Steve in disguise. When Bess becomes angry at the Santa Claus for promising Tommy an Action Man figure, Steve reveals his identity and Steve and Bess agree to go on a date. That evening, Carol calls Bess to tell her that Clare's company is going to tear down Bess's apartment building. The next day, Bess goes to a bank branch to obtain a loan to pay off her bills and a scene ensues when she accidentally pulls the toy gun out of her purse. Bess's next cleaning job is Clare's house, where she meets Eric, Clare's husband and a doctor. Eric is annoyed that Bess mistakes him for a servant, perhaps because Eric too is black. At night, Eric shares this story with Clare. The next day, Steve takes Bess to Carol's office party where Bess for the first time realizes that the woman who took her action figure, the woman whose house she has been cleaning, and the woman whose company is going to tear down her home are all one and the same.

Back at home, Bess agrees to go sledding with Steve. When Steve returns to Carol's house, he tells her about his feelings for Bess. Over the following days, Steve takes Bess and Tommy sledding and shopping. Bess and her mother

meet at a coffee shop, discuss their difficulties in finding an Action Man toy and Bess's potential romantic involvement with Steve, whom both women believe to be a mere Santa Claus impersonator rather than the owner of the toy store. Meanwhile, Steve has been trying to use his position as a toy store owner to obtain an Action Man toy for Tommy. On Steve and Bess's next date, Bess insists that they go Christmas shopping at an inexpensive store, because Bess believes that the expensive department store suggested by Steve is unaffordable for them.

The next time Bess goes to clean Clare's house, she discovers a bag full of Action Man toys and, annoyed at Clare's greed, hides one of the figures under a pillow. When Bess visits Carol's house in order to see Steve, Carol mentions that Steve is in fact a well-to-do toy store owner, and Bess, furious with Steve for having misled her, storms out. Having put Tommy, who is full of confidence that he is going to receive an Action Man figure, to bed and inspired by a drawing Tommy has made of an Action Man figure, Bess decides to break into Clare's home and retrieve the toy she had stashed away. Bess, wearing camouflage face paint, is surprised by Clare, who mistakes her for the Night Prowler, a burglar who has been plaguing the neighborhood, but Bess manages to escape with the Action Man figure. The following day, Bess and her mother have a kitchen-table conversation. Bess, in despair over her financial situation, the imminent eviction, and the fact that she is a thief, decides to return the Action Man figure. After Bess is gone, Tommy shows his grandmother the cereal-box tops he has collected to redeem for an Action Man figure and she decides to forego playing the lottery and redeem the box tops instead.

When Bess arrives at Clare's house, Clare and Eric are having a discussion on the wisdom of Clare's plans to evict poor tenants in order to make room for her development project. As Bess tries to return the Action Man figure to

Clare's stash, Clare comes upon her and for the first time notices that her cleaning woman is the woman with whom she struggled in the toy store. In the ensuing melee, Bess drops the action figure and flees the scene. Back at home, Clare again talks about Steve with her mother. The winning lottery numbers are announced and Bess's mother realizes that she would have won had she played that day. At this moment, police officers enter and arrest Bess for being the Night Prowler.

Enraged, Bess's mother heads to Clare's home and berates her in front of her party guests for having had Bess arrested. After the party is over, Clare proceeds to a local church where she, dressed in a Santa Claus suit, hands out presents to poor children. After listening to the local priest describe the children's plight, she has a change of heart. She returns home, collects all the presents under her Christmas tree, and distributes them to the poor children at a local homeless shelter. Meanwhile, Bess is released on bail, raised by her kindly neighbor, and Eric apprehends the real Night Prowler. Clare, having discovered her error in identifying Bess as the Night Prowler, heads to Bess's apartment where she tears up the eviction notice. She also offers Bess an Action Man figure, but Bess, realizing that her son needs his mother, not a toy, declines the gift. The following morning, Tommy is understanding about not receiving an Action Man figure and Bess reconciles with Steve. Tommy discovers another present, an Action Man figure after all, and for the lack of a better explanation, concludes that the real Santa must have brought it. As credits roll, a trio of Santas are seen walking towards the homeless shelter. In the final image of the proposed movie, the Santas turn around and reveal one to be black, one to be white, and one to be Japanese.

The protagonist of the JATW movie is Howard Langston, the workaholic CEO of a mattress company. Howard has promised his eight-year-old son Jamie that he would attend

the ceremony at which Jamie is to be awarded his purple belt in karate. Having been detained at the office by business calls, Howard speeds to the ceremony, but is caught by police officer Hummel and as a consequence misses the award ceremony. Howard's wife Liz instead attends the ceremony with their divorced neighbor, the oleaginous Ted, whose son also receives a belt at the ceremony. The next morning, in order to return himself into the good graces of the deeply disappointed Jamie, Howard promises to buy him a Turbo Man action figure for Christmas. After this prologue, the action skips forward to the morning of Christmas Eve at the Langston's well-appointed home. Liz asks Howard whether he bought the Turbo Man figure. Howard, who had forgotten, nevertheless claims he did. Howard leaves, according to him in order to pick up the toy from his office, but not before promising Jamie that he will attend a Christmas parade at which Turbo Man is scheduled to appear.

Howard begins his frantic search for the Turbo Man action figure at a local toy store. Here he meets Myron Larabee, a stressed-out black mailman, who also is trying to make a last-minute purchase of a Turbo Man figure for his son. When Howard and Myron ask store clerks for a Turbo Man figure, they are laughed at for expecting to be able to find this extremely popular toy at such a late date. After driving from store to store without success, Howard overhears that a store at a local mall just received a late shipment of Turbo Man figures. In his haste to get to the mall, Howard runs over Hummel's motorcycle. Hummel is not amused. At the mall, when the toy store clerks try to distribute numbered balls to establish priority for the limited quantity of Turbo Man figures, a riot breaks out. After Howard and Myron struggle across the mall for one of the balls, Howard overcomes Myron only to lose the ball to an infant.

A suspicious-looking mall Santa offers to take the dejected Howard to a secret warehouse where Turbo Man figures are

still available. At the warehouse, filled with Santa Clauses and elves, Howard pays $300 for a Turbo Man figure, only to have it revealed as a poorly made foreign knock-off, which promptly falls apart in his hands. Before Howard can complain, the police raid the warehouse and arrest the Santas and elves. Howard barely escapes by using a toy police identification badge. Howard's SUV, parked outside the warehouse, has been stripped clean by thieves.

Howard and Myron run into each other again in a coffee shop and commiserate. Myron explains to Howard how all his life's misfortunes are traceable to not receiving a particular popular toy when he was a child. A radio playing in the coffee shop announces a call-in contest offering a Turbo Man figure to the first person to name all of Santa's reindeer. Myron and Howard fight over the local payphone but only manage to break it. Instead, they start running to the nearby radio station. Howard, being in much better physical condition than the portly Myron, arrives first at the station and breaks into the broadcast booth of the program's host. Shortly afterwards, Myron too breaks into the booth and threatens to blow it up using a mail bomb he carries unless he is given the Turbo Man figure. When the host reveals that he was only offering a gift certificate, Howard leaves, but Myron drops the "bomb" which turns out to be only a regular Christmas package. On the way out of the station, Myron is apprehended by a police SWAT team, led by Hummel, but manages to escape by using another mail bomb. This bomb does explode, leaving Hummel comically singed.

Howard returns home defeated, but sees Ted and Liz decorating his Christmas tree. Jealous and enraged, Howard breaks into Ted's house to steal the Turbo Man figure that Ted had bragged about buying for his son. Inside Ted's house, Howard is attacked by Ted's pet reindeer, accidentally sets fire to several rooms, and is ultimately discovered by Ted and Liz while holding the stolen Turbo Man figure. Liz,

disgusted with Howard's behavior, leaves for the parade with Jamie, Ted, and Ted's son. After dropping off the children, Ted attempts to kiss Liz, who violently rebuffs his advances. Meanwhile, Howard shares some beers with the reindeer and also heads for the parade. There Howard, mistaken for the actor hired to play Turbo Man, is put into a high-tech Turbo Man costume, put on a float, and given a special Turbo Man action figure to present to the attending child of his choice.

At the parade, Howard/Turbo Man spots Jamie, who does not recognize him, in the crowd and gives him the Turbo Man figure. At this point, Myron, who has stolen the costume of Dementor, Turbo Man's nemesis, attacks Howard and Jamie with intent to steal the figure. In a special-effects-heavy fight between Howard/Turbo Man and Myron/Dementor, echoing an episode of the Turbo Man television program glimpsed at the beginning of the movie, Howard defeats Myron. After the fight, Howard reveals himself to Jamie. Jamie realizes that because he has the real Turbo Man for a father he does not need the action figure and gives the figure to Myron. Howard, Liz, and Jamie embrace and credits roll. In a post-credit scene, Liz wonders what Howard bought *her* for Christmas and the horrified Howard realizes that he forgot to buy her a present.

### V

Most of the issues that form the basis of a copyright infringement claim are no longer in dispute in this case. The CTBC screenplay was copyrighted. Fox did have access to the CTBC screenplay before it registered the JATW screenplay and before production of the JATW movie, but not before it received the JATW "treatment." Finally, the jury found that the JATW movie and the CTBC screenplay were substantially similar, establishing Murray Hill's copyright infringement claim. Fox appeals on the basis of the denial of its pre- and post-verdict motions for judgment as a matter of

law on the issue of substantial similarity. "Judgment as a matter of law is appropriate only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party." *Fisher v. Ford Motor Co.*, 224 F.3d 570, 574 (6th Cir. 2000) (quoting *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078 (6th Cir. 1999)).

Fox's principal basis for requesting judgment as a matter of law is the six-page "treatment" that Kornfield registered *prior* to the time that Murray Hill could establish, directly or inferentially by means of striking similarity, that Fox had access to the CTBC screenplay. At trial, Murray Hill pressed several theories about how Fox could have gained access to the CTBC screenplay earlier, but the district court found that these theories were too speculative to establish access and Murray Hill does not appeal this finding. As we noted above, striking similarity, precluding all possible conclusion but that the work was copied, can substitute for proof of access. However, even a superficial glance at the CTBC screenplay and the JATW treatment reveals that whatever the similarities, they most certainly do not approach the level precluding all possibilities but copying. Therefore, the district court rightly found that the treatment was an independent creation.

Murray Hill's claim of substantial similarity between the JATW movie and the CTBC screenplay rested on an expert-prepared list of twenty-four similarities between the two. However, of these twenty-four similarities, all but six already existed in the independently created treatment. Thus, only those six elements could possibly have been taken by Fox from the CTBC screenplay. These six remaining similarities were the children's drawings (of Action Man in CTBC and of the Langston family in JATW), the unhelpful toy store clerks (refusing to give the toy to Bess in CTBC and laughing at Howard's late request for the toy in JATW), the intrusive

neighbor (a minor sympathetic character in CTBC and Ted in JATW), and three similarities in the theft of the toy (from Clare by Bess in CTBC and from Ted by Howard in JATW). Each of these similarities is tenuous. At the level of actual expression they differ significantly, and at any level of abstraction that covers both JATW and CTBC, they are ubiquitous in literature and the cinema. We are instructed to look at such slight similarities holistically to determine whether collectively they could prove substantial similarity. Where, as here, the slight similarities are not thematically related, the whole is no greater than the sum of the parts. Therefore, if the court was required to filter out all the other similarities, summary judgment for Fox would have been appropriate.

Contrary to the parties' equally fervent, though otherwise diametrically opposed, assertions, the question of whether elements already found in a copyright defendant's earlier, non-infringing work are properly discounted in performing substantial similarity analysis is, at least in this court, one of first impression. The canonical statement of law is that *non-protectible elements* must be filtered out. *Kohus*, 328 F.3d at 855. But here the argument is not that the eighteen similarities allegedly shared by the CTBC screenplay, the JATW movie, *and* the JATW treatment were non-protectible, but rather that these elements were independently created. We turn to persuasive precedent and reason to determine whether independently created elements must be discounted.

Precedents in our sister circuits suggest that under appropriate circumstances even protectible elements may be filtered out. In *Apple Computer v. Microsoft Corp.*, 35 F.3d 1435 (9th Cir. 1994), Apple filed suit alleging that elements of Microsoft's graphical user interface infringed on the copyright of Apple's equivalent software. Significantly, Microsoft had obtained a license from Apple for some, but not all, elements of Apple's software. The court stated that

"[w]here, as here, the accused works include both licensed and unlicensed features, infringement will depend on whether the unlicensed features are entitled to protection." *Id.* at 1441. "Because only those elements of a work that are protectible and used without the author's permission can be compared when it comes to the ultimate question of illicit copying, we use analytic dissection to determine the scope of copyright protection before works are considered 'as a whole.'" *Id.* at 1443 (citations omitted). In so concluding, the *Apple* court extended the application of filtering, from unprotectible elements to protectible elements used with the permission of the copyright owner.

In *Sturdza*, an architect brought a claim against the United Arab Emirates alleging that the design of the defendant's new embassy infringed on the copyright of architectural drawings she had previously submitted to the defendant. 281 F.3d at 1291-92. The defendant contended that the design was in fact based on the work submitted by another architect. *Ibid.* The district court in performing the substantial-similarity analysis discounted elements of the embassy design that were already present in work submitted by the other architect before the defendant had access to the plaintiff's drawings. *Id.* at 1297. Because the plaintiff did not appeal this discounting, the District of Columbia Circuit also excluded the elements that were already present in the earlier work. *Ibid.*

Logic also supports the filtering of independently-created elements. The purpose of the substantial-similarity analysis is to answer the question whether the defendant copied the work of the plaintiff. Ordinarily, similar elements between known work of the plaintiff and the defendant's work will, depending on the degree of uniqueness and originality of the element, support such an inference. However, where defendant owns a prior work containing the same elements, he has no reason, beyond the illicit thrill of copyright infringement, to copy wrongfully from another what he could

legally copy from himself. Therefore, where an element occurs both in the defendant's prior work and the plaintiff's prior work, no inference of copying can be drawn. *See Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 54 (2d Cir. 1936) ("If the defendant has had access to other material which would have served him as well, his disclaimer [of copying] becomes more plausible."); *Ellis*, 177 F.3d at 507 ("[A]n inference of copying is rebuttable by evidence of independent creation of the allegedly infringing work.") (citations omitted). Such elements should be removed from consideration.

Therefore, we hold that elements of a copyright defendant's work that were created prior to access to a plaintiff's work are to be filtered out at the first stage of substantial-similarity analysis, just as non-protectible elements are. In the present case, no reasonable jury could have found substantial similarity solely on the basis of the six minor elements not so filtered. Therefore, Fox's motion for judgment as a matter of law should have been granted.

## VI

For the foregoing reasons, we **REVERSE** the judgment of the district court and **REMAND** for an entry of judgment as a matter of law in favor of Fox.